IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 10, 2022 Session

## STATE OF TENNESSEE v. CARLOS DARNELL DIXON

**Appeal from the Criminal Court for Davidson County**
**No. 2018-D-2757    Angelita Blackshear Dalton, Judge**

_____

**No. M2021-01326-CCA-R3-CD**
_____

Defendant, Carlos Darnell Dixon, was convicted after a jury trial of second degree murder, a Class A felony, and two counts of aggravated assault, a Class C felony, and sentenced to an effective thirty years in confinement. On appeal, Defendant argues that the evidence was insufficient to support his conviction for second degree murder; that the State infringed upon his Second Amendment right to bear arms by cross-examining him about his experience with guns and gun ownership; and that his sentence for second degree murder is excessive. After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JILL BARTEE AYERS and JOHN W. CAMPBELL, SR., JJ., joined.

Mark C. Scruggs, Nashville, Tennessee, for the appellant, Carlos Darnell Dixon.

Herbert H. Slatery III, Attorney General and Reporter; T. Austin Watkins, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Amy D. Hunter, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural History

This case arises from a May 11, 2018 incident in which a dispute in the parking lot of an Antioch hookah bar resulted in Defendant's shooting and killing Cesar Reza ("the victim"), who was accompanied by his girlfriend, Roshni Patel ("Ms. Patel"), and his childhood friend, Arturo Vazquez Santillan ("Mr. Vazquez"). The Davidson County Grand Jury indicted Defendant for first degree premeditated murder relative to the victim

and two counts of aggravated assault with a deadly weapon relative to Ms. Patel and Mr. Vazquez.

At trial, Patricia Gutierrez testified that the victim was her son and that he passed away just after his twenty-fourth birthday. She stated that the victim and Ms. Patel had been in a romantic relationship and had intended to marry in the future.

Ms. Patel testified that she met the victim when they were both in the eighth grade and that they grew up together. She said that she met Mr. Vazquez in ninth grade and that the victim had known Mr. Vazquez for a longer period of time. She said that, on birthdays and other important occasions, she and the victim would arrange to spend time with Mr. Vazquez.

Ms. Patel testified that May 10, 2018, was Mr. Vazquez's birthday. After Ms. Patel and the victim watched a Predators hockey game at a downtown Nashville bar, they met Mr. Vazquez at a parking garage. Ms. Patel stated that the trio walked around downtown and called other friends who met them at another bar called Crazy Town. Ms. Patel stated that she and the victim drank beer that evening; she did not recall if Mr. Vazquez was drinking.

Ms. Patel testified that, at some point after midnight, the group decided to go to Arabian Palace, a hookah bar located in an Antioch strip mall. Ms. Patel and the victim traveled in the victim's red four-door Chevrolet Silverado pickup truck, and Mr. Vazquez followed them in his vehicle. When they arrived, no parking spots were available near Arabian Palace, so Mr. Vazquez parked at a nearby restaurant. The victim then pulled over to allow Mr. Vazquez to enter the truck before the trio searched for closer parking. Mr. Vazquez sat in the backseat behind the victim. Ms. Patel testified that, while they were looking for a parking spot, they all smoked marijuana. She described the victim's demeanor as "fine, relaxed, [and] happy[.]"

Ms. Patel identified a diagram of the parking lot in front of Arabian Palace, which showed the strip mall and a row of parking spots in front of it. Ms. Patel stated that the parking spots were partially occupied and that, as they drove around a small median, they encountered two cars parked beside the median that made it difficult to pull around. She noted that the two cars were not in parking spots. Ms. Patel testified that one of the cars, a sedan, tried to back out and that the victim's truck became "stuck." Ms. Patel identified the car's driver as Defendant and stated that she had never seen Defendant before this incident. According to Ms. Patel, Defendant stepped out of his car and told them to "let him go first" because "[he] was there first." She stated that the truck's windows were rolled up and that Defendant did not address anyone in particular. Ms. Patel stated that the victim rolled down the front passenger-side window, which was closest to Defendant, and that Defendant repeated himself and added that the victim could have Defendant's parking

spot. Ms. Patel said that the victim told Defendant that they were stuck and "just needed to go around." When asked to describe the victim's tone, Ms. Patel stated that he did not yell, although she also stated that "the only reason why he was probably even yelling is so . . . [Defendant] could hear us." She added that "there was like no anger" in the victim's voice.

Ms. Patel testified that Defendant partially entered his car "to grab something" for about thirty seconds. When Defendant emerged, he looked at Ms. Patel, lifted the right side of his shirt to show her a gun, and said, "Do we have a problem here?" Ms. Patel stated that she did not see Defendant's gun during their initial interaction. She said that Defendant's tone of voice was loud and angry and that she was "[t]errified."

Ms. Patel testified that the victim rolled up her window, opened the driver's side door, stepped out onto the running board, and spoke to Defendant "over the top of the truck." Ms. Patel denied that she or Mr. Vazquez exited the truck and that the victim ever stepped onto the pavement. Ms. Patel stated both that the victim did not "say anything" to Defendant and that the victim told Defendant that they were unarmed and "harmless." Ms. Patel denied that anyone cursed at Defendant. Ms. Patel noted that Mr. Vazquez was texting with other friends on his cell phone during the incident. Ms. Patel denied that any of them made gestures toward Defendant. Ms. Patel also denied that the victim had a weapon or any object in his hand.

Ms. Patel testified that, when the victim rolled up her window, she knew "something was going to happen" and that she grabbed the victim's shirt as he stood on the running board and urged him to leave because "it [was] not worth it." Ms. Patel then saw Defendant draw the gun from his waistband, and she ducked. Ms. Patel stated that she heard a gunshot; that the bullet went past her head; that she believed she would die; and that she felt the victim's shirt leave her hand as he fell. Ms. Patel stated that the victim was ducking inside the truck when he was shot.

Ms. Patel testified that she looked up, and the victim and Mr. Vazquez were outside the truck. After hearing bystanders yelling, Ms. Patel called 911. She stated that her door was closed and that she exited the truck when the 911 operator asked her who had been shot. Ms. Patel walked around the truck and saw the victim lying on the ground with "blood everywhere." The 911 operator asked Ms. Patel to check the victim's pulse, but she could not find one.

Ms. Patel testified that the police arrived, placed her in a squad car, and took her to the police station for questioning. Ms. Patel said that she gave a statement and cooperated with the investigation. Ms. Patel subsequently identified Defendant as the shooter in a photographic lineup and stated that she was one hundred percent confident in her

identification. Ms. Patel estimated that Defendant was about fifteen feet away from her and that a "plaza light" above them illuminated the area.

On cross-examination, Ms. Patel acknowledged that her statements to the police and at the preliminary hearing differed in some respects from her trial testimony, particularly regarding her marijuana use; she had omitted such information from the police interview, and at the preliminary hearing, she only admitted to having used marijuana at 4:00 p.m. She affirmed that she smoked marijuana in the afternoon, drank one or two beers in the evening, and smoked marijuana again for about one minute while the victim looked for a place to park.

Ms. Patel acknowledged that she now knew that the victim was "extremely intoxicated" based upon his blood alcohol content and that he had been smoking marijuana "just a few seconds" before the shooting, although she denied that the victim appeared to be intoxicated. Ms. Patel also denied that she was minimizing what she and the victim did leading up to the shooting.

Ms. Patel testified that she did not know how close the victim's truck was to Defendant's car. She affirmed that Defendant could not back up his car to leave. She agreed that most of the parking spaces in front of Arabian Palace were occupied. Although Ms. Patel did not recall whether other cars were driving past the victim's truck, she stated that they were blocked from behind by a car. Ms. Patel denied that the victim would have had to move his truck in order for Defendant to leave. She explained that Defendant had backed up "just slightly" and that, if Defendant had pulled forward, the victim could have pulled around him. Ms. Patel opined that Defendant had enough space to pull forward and drive away. When confronted with her failure to mention Defendant's ability to drive away at any previous interview, Ms. Patel denied that she came to this conclusion at trial.

Ms. Patel testified that the only thing she said during the exchange between Defendant and the victim was, "[T]hat's not a parking spot." She noted that she "didn't say it loud enough" for Defendant to hear her, and she denied saying "anything insulting or offensive." Ms. Patel stated that the victim "was addressing the situation the entire time." She denied that the victim exited the truck and walked around it to talk to Defendant. Ms. Patel acknowledged that, at some point the situation became "more tense," but she did not recall whether Defendant or the victim said anything aside from the statements to which she had already testified. She stated that, other than asking whether they had a problem and showing his gun, Defendant did not say anything insulting or threatening to them. Ms. Patel opined that no reason existed to prompt Defendant's showing them his gun. When asked whether she pulled the victim back into the truck because "things were getting . . . out of hand," Ms. Patel claimed that she did so because Defendant showed her his gun. She agreed that the victim saw the gun, but she did not recall what the victim said about

the gun. Ms. Patel denied, though, that the victim said, "[S]o what, so what," or anything similar.

Ms. Patel acknowledged her statement to police that Mr. Vazquez stepped out of the truck to pull the victim back in. Ms. Patel clarified that Mr. Vazquez also stepped onto the truck's running board and that both truck doors were open. Ms. Patel denied that she said, "[L]et's not start this," and she did not recall whether Mr. Vazquez made that statement. Ms. Patel said that, "for the safety of all of [them]," she and Mr. Vazquez felt it necessary to pull the victim into the truck.

Ms. Patel stated that the police interviewed her at about 3:30 a.m. after the shooting. She denied that she and Mr. Vazquez discussed the shooting with one another before they were taken to the police station. Ms. Patel acknowledged telling the 911 operator that she did not know what happened. She explained that she was concerned with getting help for the victim and that "[she] was not worried about discussing what had just happened." Ms. Patel acknowledged that, during her thirty-five-minute police interview, she did not cry and was calm.

On redirect examination, Ms. Patel testified that, in the recording of her police interview,[1] she did not appear to be intoxicated, slur her words, or act confused. She testified that she and Mr. Vazquez pulled the victim back into the truck because they were unarmed, "a gun was involved," and "it wasn't worth losing a life[.]" Ms. Patel asserted that they just wanted to go home safely.

Shkelzen Zymeri testified that, on May 11, 2018, he was working as a security guard at Arabian Palace. He stated that his duties included checking identification and patting down patrons for weapons before they entered. Mr. Zymeri said that Defendant came to the bar once or twice per week, that Defendant usually parked beside the median in front of the bar, and that on the night of the shooting, he patted down Defendant as he entered Arabian Palace between 11:00 p.m. and 12:00 a.m.

Mr. Zymeri testified that he was at his post outside of the front door between 1:00 and 2:00 a.m. when he heard a gunshot in the parking lot about thirty feet away. Mr. Zymeri saw Defendant, who had a gun in his hand, "jump[] into a car" and drive off quickly without turning on his headlights. Defendant later testified that after the shooting, the car parked in front of his sped away, allowing him to drive forward and out of the parking lot. Mr. Zymeri testified that he walked to the victim and attempted to render aid, but the victim passed away within seconds. He noted that a "panicking" woman with blood

---

[1] The recording was not played for the jury or entered as an exhibit. Ms. Patel used the recording to refresh her recollection during a recess.

on her shirt and another man were with the victim, although he did not interact with them. Mr. Zymeri testified that he did not hear an argument in the parking lot prior to the shooting and that, if he had heard one, he would have followed an unspecified protocol. Mr. Zymeri denied that he saw a weapon around the victim or his companions.

On cross-examination, Mr. Zymeri testified that it was a busy night and that many cars were parked in front of the bar; he noted that "the club was letting out" and no new patrons were entering at the time of the shooting. Mr. Zymeri was standing outside the bar's front door. He stated that people parked beside the medians in front of Arabian Palace, that he was not required to ask them to move, and that he did not consider parking beside the medians to be a problem.

Erica Beasley testified that, on March 11, 2018, she was also working security outside Arabian Palace's front door when she heard a gunshot. Ms. Beasley saw a red truck "sitting . . . horizontally" with a door open and a person lying outside of the front driver's-side door. She estimated that the truck was as far from her as the witness stand was from the State's counsel table.[2] Ms. Beasley stated that she had not heard any arguing "out of the normal" before the gunshot, and she noted that, if she had heard an argument or someone needing help, she would have responded to it. Ms. Beasley did not see any weapons around the red truck.

On cross-examination, Ms. Beasley testified that Arabian Palace closed at about 2:00 a.m. and that the shooting occurred within two hours of closing time. She was not sure if people were still entering the club at the time of the shooting, but she agreed that the security team would have been checking identification and patting down anyone who was entering. She affirmed that people were also leaving. Ms. Beasley stated that people speaking loudly was common in the parking lot. Relative to her testimony that she heard no arguing, Ms. Beasley acknowledged that she was "a pretty good distance away" from the truck.

Metro Nashville Police Department (MNPD) Investigator Jefferson Hughes testified that, on May 11, 2018, he was working as a patrol officer and responded to a shooting call at Arabian Palace. Investigator Hughes said that the first officer on the scene was applying pressure to the victim's wound. Investigator Hughes checked the victim's pulse and, finding none, began chest compressions. After a medic arrived, Investigator Hughes took Ms. Patel to his patrol car to isolate her from other witnesses until she could be transported to the police station for an interview. Investigator Hughes said that he was not involved with any of the other witnesses but that they would have been similarly isolated from one another. He affirmed that he checked Ms. Patel for weapons before she entered his police cruiser and that he found none on her person. He denied that any

---

[2] This measurement was not otherwise defined in the record.

weapons were located at the crime scene. Investigator Hughes noted that detectives attempted unsuccessfully to obtain surveillance recordings from Arabian Palace.

On cross-examination, Investigator Hughes testified that he received the dispatch call at 1:20 a.m. and arrived at around 1:25 a.m. When asked whether the scene was unsecured for ten minutes, during which time people could have done "whatever they want[ed] to with weapons," Investigator Hughes responded that he did not know.

Mr. Vazquez testified that he was serving a sentence in New York for July 2018 convictions for criminal possession of a weapon and "menacing" and that he had been transported to the Davidson County jail to facilitate his testimony at Defendant's trial. Mr. Vazquez stated that he did not have any other criminal convictions and that, before the victim's death, he did not own a weapon. He said that he procured the weapon after the shooting "for [his] own safety."

Mr. Vazquez testified that he and the victim were friends for about twelve years and that they had celebrated his birthday together for the four years preceding the shooting. Mr. Vazquez had known Ms. Patel since their freshman year of high school. On May 10, 2018, Mr. Vazquez called the victim and asked if he wanted to go out; the victim responded affirmatively, and Mr. Vazquez met him and Ms. Patel at a parking lot around 10:00 p.m. They walked to a bar and spent time "on Broadway" until midnight with other friends. Mr. Vazquez stated that he drank one or two Corona beers and that the victim and Ms. Patel also drank one or two beers each.

Mr. Vazquez testified that the group decided to go to Arabian Palace and that he drove himself, while Ms. Patel rode with the victim. Mr. Vazquez parked his car in front of a barber shop and got into the victim's truck, sitting behind the victim. When asked whether they smoked marijuana, Mr. Vazquez responded that they were "about to" but never did because of the shooting.

Mr. Vazquez testified that, over the course of their friendship, he had seen the victim's demeanor after drinking beer and smoking marijuana. Mr. Vazquez stated that had never seen the victim "act crazy" when drinking and smoking. Mr. Vazquez said that, on the night of the shooting, the victim was "chilled" and calm.

Mr. Vazquez then gave the following account of the relevant events:

> So we [were] trying to make a turn and I guess the guy thought that we were trying to take his parking spot, but we were just really trying to turn and he got out of his vehicle and he was quick to pull up his shirt and show a gun. I don't know I guess he thought we were trying to hit his car. I don't know what he thought, but he got out quick and he showed his gun and I

guess [Ms. Patel] was trying to explain to him, tell him that you know we're not trying to take your parking spot.

Mr. Vazquez later identified the man as Defendant. Mr. Vazquez stated that Defendant was parked "in the curb," which he described as "a drive-thru[.]" Mr. Vazquez stated that Ms. Patel's window was initially closed when she was talking to Defendant and that she started to roll it down. Mr. Vazquez said that he told her not to engage Defendant in conversation and encouraged the victim "to keep going" but that passing cars blocked their way. Mr. Vazquez stated that, in addition to telling Defendant that they did not want his parking spot, Ms. Patel asked what Defendant's "problem" was.

Mr. Vazquez testified that he could not hear if Defendant had spoken or replied to Ms. Patel because the truck's windows were closed. He agreed that Ms. Patel had the best opportunity to see and hear Defendant because she was closest to him. Mr. Vazquez stated that, although he could not hear Defendant, when Defendant lifted his shirt, he discerned from Defendant's body language that he had asked if they "had a problem[.]" Mr. Vazquez said, "[H]e was upset obviously. He was upset over I guess his parking spot. I'm not sure." Mr. Vazquez described the victim's and Ms. Patel's tone of voice as "just regular. It[ was] not loud arguing, but [was] more like . . . trying to, you know, make their point that [they were] not trying to take his parking spot."

Mr. Vazquez testified that, as he was telling Ms. Patel not to say anything, the victim said, "[I]f anybody is going to explain to him or going to tell him something . . . it's going to be me" because the victim was driving. Mr. Vazquez stated that the victim opened his door and "lean[ed] over the windshield" to address Defendant while standing on the running board. He denied that the victim ever stepped onto the pavement. Mr. Vazquez said that, at first, the victim and Defendant seemed to argue about the victim's not wanting the parking spot but that they seemed to "c[o]me to an agreement," and Defendant seemed to calm down.

Mr. Vazquez denied that the victim, Ms. Patel, or he had a weapon in the truck. He similarly denied having spoken to Defendant during the incident and that anyone in the truck cursed at Defendant. Mr. Vazquez stated that Defendant's showing his gun made him feel afraid for his and his friends' lives, and he opined that they did nothing to Defendant "for him to take it to that level that quick."

Mr. Vazquez testified that he kept telling the victim to stop, keep going, and ignore Defendant. He stated that the victim began to step back inside the truck but "jumped back up" and resumed arguing after Defendant said something. Mr. Vazquez said that he grabbed the victim's pants and pulled him back into the truck and that, one or two seconds later, the victim was shot.

Mr. Vazquez testified that, when the gunshot occurred, Ms. Patel's window was closed and that he leaned around Ms. Patel to see Defendant. Mr. Vazquez stated that he saw Defendant point his gun, shoot at the victim, and then leave in his car. Mr. Vazquez did not realize anyone had been wounded until the victim opened his door and stepped out of the truck. The victim had blood "gushing" from his mouth and chest, and Mr. Vazquez got out of the truck and helped the victim lie down on the ground. Mr. Vazquez tried to help the victim by holding pressure on the wound. He said that both he and Ms. Patel called 911.

Mr. Vazquez testified that the police arrived, placed him in a patrol vehicle alone, and took him to the police station for an interview. On May 16, Mr. Vazquez viewed a photographic lineup. He stated that he chose a photograph but that he was not one hundred percent certain; as a result, the lineup form reflected that he did not make a selection.

On cross-examination, Mr. Vazquez testified that the victim and Ms. Patel had been downtown watching the hockey game for about four hours before he joined them. He said that they smoked marijuana in the parking garage before going to a bar. Mr. Vazquez stated that they each had one beer there, then went to Crazy Town for about thirty minutes; Mr. Vazquez had another beer. He did not recall telling the police that Ms. Patel drank whiskey and cola at Crazy Town; however, he acknowledged that his memory was more accurate at the time of the interview.

Mr. Vazquez testified that, when the victim stepped onto the truck's running board, the truck was two or three feet from the back of Defendant's car and that Defendant could not pull forward because a car was parked in front of him. He noted that Defendant could have pulled out "like anybody else[,] just go back and forth[.]" Mr. Vazquez did not remember the victim's pulling forward and revving the truck's engine. Mr. Vazquez stated that the victim could not pull around Defendant's car because cars were passing by on "[b]oth sides." He agreed that there would have been space for the victim to pass Defendant once traffic had cleared. Mr. Vazquez later affirmed that the lane had cleared by the time he pulled at the victim's clothing and urged the victim to drive around Defendant. Mr. Vazquez denied that the victim told Defendant, "I see your gun, you are not scaring me," or "I'm not afraid of you, I'm not afraid of that gun[.]" He also denied telling the police that the victim had an "attitude."

Mr. Vazquez testified that Defendant took "maybe a couple of steps" during the argument and was not close enough to touch the victim's truck. Mr. Vazquez estimated that the encounter lasted between one and two minutes. Mr. Vazquez denied getting out of the truck during the argument.

MNPD crime scene investigator Claire VonDohlen testified that she photographed the crime scene, including the victim's truck. The photographs reflected a marijuana

"cigar" on the ground beside the driver's side of the truck; that the front passenger-side window in the truck was intact but shattered and had a hole near the front door frame; a bullet "defect" on the inside of the passenger door; a bullet fragment that landed on the rear driver's-side door handle ledge; and a shell casing on the ground outside the truck.

MNPD Officer Warren Fleak testified that he processed the victim's truck once it arrived at the police laboratory and that he did not find any weapons in it.

MNPD Sergeant Robert Smith testified that he took measurements and data used to create a "Faro" scan of the scene. The scan was an interactive program that displayed an aerial photograph of the crime scene as it appeared after the police secured the scene, including the victim's truck, as well as a 360-degree panoramic view from three vantage points around scene. The program allowed the user to measure the distance between any two points on the aerial photograph or panoramic depiction.

MNPD Detective Desmond Sumerel testified that, during the day on May 11, 2018, he obtained a surveillance recording from a barber shop in the same strip mall as Arabian Palace; although the camera did not capture the shooting, the recording showed cars passing and had sound. The recording reflected a puttering sound consistent with a machine's running and showed the partially-occupied strip mall parking lot. Periodically, people could be heard talking, including several instances in which women yelled or laughed loudly. Detective Sumerel identified the victim's truck driving past the camera. About two minutes later, bangs were audible, which Detective Sumerel identified as a single gunshot and an unrelated motorcycle's backfiring repeatedly. Several cars quickly drove through the parking lot toward an exit, one of which did not have its headlights illuminated.

Matthew Alvarado testified that he spent time with the victim, Ms. Patel, and Mr. Vazquez at Crazy Town before the shooting and that he arrived at Arabian Palace after the shooting occurred but before police arrived. Mr. Alvarado described the victim's demeanor earlier in the evening as relaxed. Mr. Alvarado admitted that he had a gun in his truck that evening but reiterated that he was not present during the shooting. He denied that the victim or anyone else in their group had a weapon.

On cross-examination, Mr. Alvarado denied that Mr. Vazquez or the victim ever carried a gun. Mr. Alvarado stated that, at Crazy Town, he had one or two beers. Mr. Alvarado denied smoking marijuana with the victim and Mr. Vazquez.

MNPD Detective John Joyce testified that he responded to the crime scene and spoke to Ms. Patel and the victim's friends, Mr. Alvarado and "Mildred." Detective Joyce described Ms. Patel as upset, and he denied that she was armed. He spoke to Arabian Palace's owner, who informed him that their surveillance cameras only "recorded live

footage" and did not save it.  Security guards at Arabian Palace reported to Detective Joyce that they had not heard anything in the parking lot prior to the shooting.

MNPD Detective Phillip Klarer testified that he was lead detective in the shooting investigation and that the victim had no weapons, ammunition, or firearm-related items on his person.  He identified two shirts removed from the victim at autopsy, as well as a spent bullet and bullet fragment removed from the victim's body.

Detective Klarer testified that he served Defendant with an arrest warrant in Rutherford County on May 17, 2018, and that he obtained a search warrant for Defendant's home and vehicle.  Police found a .9mm Glock magazine and two unfired .9mm bullets in Defendant's home and an additional .9mm Glock magazine and one unfired .9mm bullet in Defendant's car.  No firearms were found in the searches.

Detective Klarer identified two iPhones recovered from Defendant's car.  Pursuant to a search warrant, police recovered text messages and internet searches from the hours and days after the shooting.  Police composed a summary of relevant items, which reflected as follows:

| Type | Author | Date and Time | Content |
|---|---|---|---|
| Searched items | | 5/11/2018 8:39 a.m. | best criminal lawyer in nashville tn |
| Instant Messages | "Jhamar" | 5/11/2018 10:28 a.m. | Try and get rescheduled today for a later time and I would go ahead and fly out to the West Coast and don't tell anybody because people be talking |
| | | 5/11/2018 10:48 a.m. | Don't say sh-- u good |
| | | 5/11/2018 11:54 a.m. | If anything in that house u need to move it |
| | | 5/11/2018 12:58 p.m. | Just go out West cuz leave please man Leave ain't no judge or lawyer on yo side go away and take some time and think and that way u can still get money |
| Searched items | | 5/11/2018 6:10 p.m. | manslaughter |
| Searched Items | | 5/11/2018 6:10 p.m. | manslaughter tn |
| Searched Items | | 5/11/2018 6:12 p.m. | tennessee voluntary manslaughter sentence |
| Searched Items | | 5/11/2018 6:13 p.m. | first degree murder tn |

| Searched Items | | 5/11/2018 6:14 p.m. | manslaughter tn time |
|---|---|---|---|

Detective Klarer testified that his review of Defendant's cell phone data did not reflect that Defendant performed similar internet searches before the shooting. He stated that, from the time of the shooting until Defendant's arrest, Defendant performed numerous internet searches for the news, "hookah bar shooting," and topics related to the shooting. On cross-examination, Detective Klarer testified that Defendant was arrested near his home in Rutherford County and that no evidence existed to suggest Defendant "went out West" before his arrest.

Dr. Erin Carney, an expert in forensic pathology, testified that she performed the victim's autopsy. The victim was five feet, eleven inches tall and weighed 168 pounds. Dr. Carney stated that the victim had a gunshot wound on the right side of his chest under the collarbone; the bullet traveled through the top of the right lung and both lobes of the left lung, injuring the "right brachial cephalic vein" and the aorta before becoming lodged in the victim's shoulder blade. The victim also had a superficial graze wound on the left side of the chest that was consistent with his being wounded by "some sort of bullet fragment," lacerations to the victim's face, right hand, and right forearm likely caused by the shattered auto glass, and an abrasion to the right elbow likely caused during resuscitation measures. She stated that the glass-related injuries were consistent with the victim's leaning into the vehicle when he was shot. Dr. Carney testified that the victim's blood sample tested positive for alcohol and marijuana metabolites. His blood alcohol content was 0.135. Dr. Carney determined that the victim's cause of death was the gunshot wound to the chest and that the manner of death was homicide.

After the State rested, Defendant presented proof. Myrone Sanders testified that, on the night of the shooting, he arrived at Arabian Palace about 1:00 a.m. and parked between Arabian Palace and another club, Cloud 9, in the strip mall. Mr. Sanders stated that, as he stood in the parking lot smoking a cigarette and waiting for a friend to arrive, he heard two people arguing about a parking space or "someone needing to move." Mr. Sanders estimated that he was between fifteen and twenty feet away from the people. Mr. Sanders said that he saw a large red truck with its driver's side door "wide open," the victim[3] standing on the pavement beside the "front quarter panel," and Defendant standing "right outside" the driver's side door of a car.

According to Mr. Sanders, Defendant told the victim to back up and "let [him] out." The victim responded, "I'm not moving anywhere. I don't [have] to move," and a third man exited the truck and tried to persuade the victim to get back into the truck. The victim

---

[3] Although Mr. Sanders was unfamiliar with both men and did not know their names, he answered questions which assumed the victim's and Defendant's identities.

said, "I don't got to get in. I don't got to go nowhere. He don't scare nobody. He ain't running nothing . . . . We got guns too. He don't scare nobody. We ain't got to move." Mr. Sanders stated that the victim

> [got] to his truck and he was on his truck, half-way in, half-way out, like, what's up, you know, what you want to do? We ain't going nowhere. We got guns. You want me to move, move us, you know, and he reached down like he was fixing to get his gun and the next thing I know[,] . . . I heard a shot and everybody took off, you know. I took off.

Mr. Sanders testified that he was never contacted by the police and that he was introduced to Defendant by two friends from Chicago. Mr. Sanders met Defendant for the first time one week before trial.

On cross-examination, Mr. Sanders testified that he never called the police or the District Attorney's Office with this information. He denied hearing about the shooting on the local news, and he noted that he did not watch the news. Mr. Sanders acknowledged that he had prior convictions for attempted carjacking in 2002, aggravated burglary in 2012, and felony theft in 2012.

Mr. Sanders testified that he was from Memphis. Mr. Sanders did not know how his friends knew Defendant, and he was unaware that Defendant had ties to Memphis. Mr. Sanders averred that, although he was initially uncertain about talking to defense counsel, he met Defendant at defense counsel's office after Defendant called him.

Mr. Sanders indicated on the crime scene diagram where he was parked in relation to the victim's truck, and he stated that he had to look over the tops of other parked cars to see the truck. He acknowledged that, according to the diagram, he would have been about sixty-two feet away from the victim's truck. Mr. Sanders maintained, however, that he was about twenty-five feet away.

Mr. Sanders agreed that the victim's saying, "We have guns too," indicated an awareness that Defendant had a gun. Mr. Sanders affirmed that the victim was standing on the truck's running board and reaching into his truck when he was shot. He agreed that he did not see the victim or anyone in the truck with a weapon. Mr. Sanders did not hear anyone other than the victim speak to Defendant. Mr. Sanders said that he saw Defendant standing outside his car "in the street" by a median. Mr. Sanders stated that he saw a bullet strike the victim, but he did not see the victim fall to the ground.

Mr. Sanders testified that, although he did not see the victim with a gun, he knew the victim was retrieving a gun because "[the victim] was adamant. He was furious like he had a point to prove, like he wasn't fixing to move his truck . . . . [H]e was going to show

- 13 -

that he wasn't scared[.]" Mr. Sanders stated that, after the victim yelled about also having guns, Mr. Sanders realized that "everybody . . . [had] a gun but [him]," and he left.

Defendant testified that, on May 10, 2018, he woke up from a nap to find that a friend to whom he owed eighty dollars had called him several times. The friend asked to be paid back and told Defendant that he would be at Arabian Palace that evening. Defendant stated that he was tired and did not want to go out, but the friend insisted that he needed the money, and Defendant agreed to meet him. Additionally, a female friend sent Defendant a text message around 10:00 p.m. asking him to pick her up from a club; he agreed to pick her up after he delivered the money to his friend at Arabian Palace. Defendant arrived at Arabian Palace at 11:00 p.m.

Defendant testified that he had been a regular customer at Arabian Palace for three or four years because it was convenient to his home. Defendant stated that he was carrying a .9mm Ruger pistol on his hip, which was his habit, and that he generally left the gun in a locked center console when he entered establishments like Arabian Palace that prohibited weapons. He said that, when he returned to his car, he always transferred the gun back to his hip. When asked why he carried a handgun, Defendant responded that he had two friends who were "gunned down at hookah bars." Defendant averred that he was "not a felon" and had never been in trouble; he noted that he began to carry the handgun when state law changed to allow him to carry one without a permit.

Defendant stated that he arrived at Arabian Palace before midnight, when it was less crowded, and parked beside the median out of habit. He noted that he was not going to stay long and that several parking spaces between Arabian Palace and Cloud 9 were available. He said that he "went and spoke to everybody," including the owner, a bartender, and some acquaintances, and that he had one drink. Defendant stated that he left because another friend asked him to bring them chicken wings.

Defendant testified that, as he left Arabian Palace, he visited a food truck in the parking lot and returned to his car. After putting the food in the passenger seat, Defendant sat down, unlocked the middle console, and placed his gun in his hip holster. Defendant began backing out because a "gray Yukon XL" was parked in front of him "bumper-to-bumper." He said that he did not see the victim's truck and that Ms. Patel yelled, "Watch out where the F you going. You almost backed into us." Defendant stated that Ms. Patel's window was down and that the victim argued with her and told her to be quiet. At this point, Defendant was in his car, and his window was down.

Defendant testified that he told Ms. Patel that he was trying to leave and asked if they were going into Arabian Palace. Ms. Patel replied negatively, and Defendant asked if she was sure and told her that they could have his parking spot. He stated that he was not yelling or upset, but he noted that, as Ms. Patel yelled that he had almost hit them, they

- 14 -

"had words" and he told her, "[D]ude, shut up nobody almost hit you."  At this point, the victim closed Ms. Patel's window, told her to be quiet, and exited the truck.  Defendant said that he turned around and looked out his window to see if he had hit the victim's truck and that the victim walked around to stand between the truck's headlights.  Defendant assumed that the vehicles had collided, exited his car, and stood in the open door.  Defendant referenced Mr. Vazquez's testimony that the victim and Defendant reached a "mutual agreement," and Defendant added that both of them determined that the vehicles had not collided.  Defendant said that he had taken one or two steps toward the back of his car to inspect it and that he was standing "between [his] back and front door[.]"

Defendant testified that the victim was "automatically . . . p---ed off" and that Defendant offered him the parking spot, which the victim declined.  Defendant noted that he never pulled up his shirt and that the victim did not initially notice Defendant's gun.  Defendant stated that the argument became more "heated," and he described his interaction with the victim as follows:

> At that point I am still standing by my door.  He sees my gun because . . . I had on like some skinny jeans and a white tee, so he sees my gun . . . sticking out and he was like, ["]You think I've got to move because you got a gun?["]  I said, "Dude, what is your problem?"  I said, "I'm trying to give you this spot.  I'm just trying to leave."

> I told him that several times . . . .  I don't know if he fe[lt] like he was being disrespected or that I was trying to tell him what to do, but he just kept getting madder and madder.  I knew, I wasn't going to say I knew, but he was drunk.  He was slurring his words.  ["]I don't give a f--k.  I'll move.  I'm not going to move.  You can't make me move.  You can't make me move.["]

> And when he saw my gun is when the gun situation came about.  ["]You think I'm scared.  I got to move because you got a strap.  You got a strap?"  I'm like, [b]ro, you tripping.  I'm leaving . . . .  He is still, ["]You can't tell me what to do.  I don't care that you got a gun.  We all got straps.  Do something.  I got a strap too.  What you want to do?  I got a strap too.["]

Defendant stated that Ms. Patel yelled at the victim to "stop it" and get back into the car.  Defendant said that he asked the victim if he could leave, that the victim turned around, and that the argument began again.  He stated that Ms. Patel did not speak to him because her window was closed and that she continued yelling at the victim to get back into the truck.  Defendant said that Mr. Vazquez also said, "[L]et's go," but did not speak otherwise.

Defendant testified he turned to enter his car, assuming that the victim would let him leave.  According to Defendant, the victim walked back around the truck to the driver's

- 15 -

side while yelling that they had guns too and that he did not have to move his vehicle. Defendant estimated that this exchange lasted at most four minutes and that he repeatedly told the victim that he was trying to leave, that they could have his parking space, and that it was "not that serious." Defendant assumed that the victim began talking about guns because he saw Defendant's gun and was intimidated. Defendant denied ever bringing up a gun during the argument.

Defendant testified that the victim opened the truck door, stepped onto the running board or "panel," and yelled, "That is what I thought. What you want to do? . . . [W]e got straps too. Wait a minute. We got straps too." Defendant stated that Mr. Vazquez opened his door and stepped out onto the pavement and that Defendant saw the victim reach down. Defendant did not see Ms. Patel's pulling on the victim's clothing. Defendant continued:

> [W]hen [the victim] reached down and came back up I didn't even wait to see if he had a gun because I was already scared at that point because I was there by myself. I didn't know if they had a gun or not. I didn't know if he was playing, talking about we got straps too.

> I didn't know how serious he was . . . . We were arguing, but when he saw my gun and he got to yelling, I assume, he did, he got to yelling about the straps too, . . . that is when I shot him.

Defendant averred that he did not intend to hurt anyone in the truck. He noted that he only shot once at a person who was threatening him. Defendant speculated that the victim may have taken offense to Defendant's response to Ms. Patel. He noted that the victim repeated eight to ten times that he had a gun. Defendant stated that he shot at the victim because he did not know if the victim "was coming back up with a strap[.]"

Defendant testified that, when the victim initially pulled up near his car, one or two cars may have been blocking the victim from leaving. He said that, during the argument, traffic had cleared such that the victim could have "moved on." Defendant reiterated that, if the victim had moved "back two inches," the victim could have taken his parking spot.

Defendant testified that, after he fired his gun, he did not know whether Mr. Vazquez would "retaliate," given that the victim had referred to multiple guns. Defendant noted that he did not know if he hit the victim or whether the victim had grabbed a gun inside the truck.

Defendant identified two photographs of two sedans in front of Arabian Palace, which were received as an exhibit. Defendant agreed that the photographs recreated the positioning of his and the victim's vehicles at the time of the shooting. The photographs reflected that the first sedan was parked parallel to a curb, and another sedan was partially

- 16 -

behind the first sedan at roughly a forty-five-degree angle and facing the same direction; the first sedan's back bumper was almost touching the second sedan's back passenger-side door. Defendant noted that the victim's truck bed more completely blocked his car than was shown in the photographs. He added that he was parked two or three inches closer to the curb than the sedan in the photographs. Defendant estimated that the victim's truck was between one and two feet from his back bumper. He repeated that if he could have backed up and driven away, he would have.

Defendant testified that, after he left the scene, he drove home; he explained that with "the magnitude of the situation" he was afraid and uncertain if the victim and Mr. Vazquez were going to shoot into his car. He noted that he did not pick up the woman who was expecting him and that his cell phone would reflect her asking where he was via text messages.

Defendant testified that, around 3:30 a.m., he spoke by telephone with Kelsey, a bartender at Arabian Palace; she reported that someone had been shot, and Defendant learned at 4:00 a.m. that the victim had died. Defendant said that he searched for news regarding the incident and a criminal defense attorney after learning of the victim's death. Defendant said that he was afraid and that he performed the searches in advance of contacting his parents and turning himself in to police. He denied that he left the area, and he noted that he lived ten minutes away from Arabian Palace.

Defendant testified that he was "down" in the days following the shooting because he had never shot anyone before. When asked why he did not turn himself in immediately, Defendant responded that he was afraid for his safety. Defendant agreed that he was arrested near his home five or six days later. Defendant acknowledged Jhamar Hinds' text message urging him to "go out West," and he noted that he did not flee the state. He stated that Mr. Hinds had gone to Arabian Palace and knew about the incident.

Defendant testified that Detective Klarer interviewed him after his arrest. Defendant admitted that he lied to Detective Klarer during the interview because he was afraid to go to jail and did not "want any retaliation against [him.]"

On cross-examination, Defendant testified that, at the time of the shooting, he was six feet, one inch tall, and weighed between 180-190 pounds. When asked whether he was "very familiar" with guns, he responded that he bought guns, although he did not have a carry permit. Defendant stated that he had fired guns "several times" at a shooting range in Murfreesboro, where he had a membership. He said that, at the time of the incident in this case, he owned the .9mm Ruger pistol he carried and an AK-47 he kept at home. Defendant "guessed" but did not know if the Ruger was semi-automatic, and he noted that he was "one of those type of people that . . . might buy a gun because it looks the way it looks."

- 17 -

Defendant testified that, before the incident, he had shot the Ruger twice at the shooting range. Defendant initially claimed not to know if the Ruger had a safety mechanism but later affirmed that it did. He agreed that, in order to fire the gun, he had to load the magazine with individual bullets, install the magazine into the gun, disengage the safety mechanism, manipulate the slide to chamber a bullet, and squeeze the trigger. Defendant stated that, on the night of the incident, his gun was already loaded; he believed that he loaded it the last time he went to the shooting range. He said that a bullet was already chambered, but he could not "say it . . . definitely wasn't on safety." Defendant then said that the gun was not on safety because he kept it for protection and never left his car without it. He noted the delay in retrieving the gun from the locked center console in an emergency if it were on safety and unloaded.

Defendant acknowledged that he entered his car, opened the locked console with a key, and placed the gun in his waistband. When asked whether those were choices he made that evening, Defendant responded that it was "just a routine." Defendant affirmed that he knew that by pulling the trigger, he would fire a bullet that would create "a hole" in any person or object it hit. He agreed that being struck by a bullet could possibly kill a person. Defendant added, though, that he "didn't make a choice" to fire the gun during the incident, explaining that he feared for his life and "thought somebody else was picking up a gun which they said that they had over [eight] to [ten] times and was . . . fixing to aim one back at [him]."

Defendant testified that, before his police interview, Detective Klarer informed him of his rights. Defendant acknowledged that he was college-educated and chose to waive his rights by speaking to the police. Defendant also stated, though, that he asked "at least ten times" to speak to his attorney, that the police presented his rights for "a brief split second," and that the police made Defendant feel as though he had to talk to them.[4] He noted that he was not thinking rationally. Defendant acknowledged that Detective Klarer did not threaten to send him to jail if he did not give a statement. Defendant stated that he chose to talk to Detective Klarer "for a brief minute, minute and a half" before asking for an attorney.

---

[4] During a jury-out hearing, the trial court asked the parties to address Defendant's statements about being denied an attorney during his police interview. Defense counsel stated that he had not filed a pretrial motion to suppress because "[the defense team] made a strategic decision early on that [Defendant] would have to testify in this case." He explained that no other witnesses came forward apart from Mr. Sanders and that "since [Defendant] was going to have to testify then the statements he said could be used against him." Upon questioning from the trial court, defense counsel continued, "Even if you had suppressed the statement, Judge, if he testifies, they can use it against him." The State noted that it did not intend to introduce a recording of the statement because Defendant referred to unspecified issues in Rutherford County.

Defendant agreed that he had reviewed his recorded police interview. He acknowledged telling Detective Klarer that he left before the shooting, and he explained that he lied because he was "in fear for [his] life for retaliation." Defendant testified that "[thirty] people . . . pulled up at the hookah bar the next night looking for [him]." Defendant testified that, in his interview, he told Detective Klarer that "Mina," the owner of Arabian Palace, and Kelsey could verify Defendant left before the shooting. Defendant acknowledged that he asked Detective Klarer what happened in the parking lot at Arabian Palace and talked about the incident as though he had not been present, including stating that he left before the shooting occurred and acting like he did not know to which truck Detective Klarer referred. Defendant admitted that he told Detective Klarer that he had nothing to do with the shooting; that there was "nothing to talk about" because he was not present; that he was being honest with Detective Klarer; that Mina and Kelsey would corroborate that Defendant left and "did not do anything violent"; that his cell phone records would reflect a call or message from a woman stating that she was glad Defendant left before the shooting; and that he was being falsely accused and would not confess to a crime for which he was innocent. Defendant agreed that he asked Detective Klarer why he would have argued about a parking spot; urged the police to review surveillance footage that would exonerate him; stated that he learned about the shooting on the news; said that no one shot "out of [his] car"; repeatedly denied shooting the victim or harming anyone; and indicated his disbelief that anyone identified him as the shooter. Defendant admitted that these statements were lies, explaining that he "felt pressured" after he was not permitted to speak to an attorney. He added that Detective Klarer took a water bottle away from him and said that, if Defendant would not talk to the police, he could not have anything to drink. Defendant did not recall whether Detective Klarer yelled at him, although he agreed that no police officers or members of the Hispanic community were in the room "menacing" or threatening him. Defendant denied knowing that Arabian Palace's surveillance cameras did not record. He acknowledged being on a first-name basis with Mina and having a romantic relationship with Kelsey. Defendant agreed that, during the eighteen-minute interview, he chose to lie thirty times.

When asked when he planned to turn over his gun to the police, Defendant responded that, when he was arrested, his car window "was messed up" and that the gun was stolen. Defendant denied that the gun "just happen[ed] to disappear" and averred that his car had been broken into three times. When asked whether the gun went missing before or after the text message from Mr. Hines urging Defendant to get rid of something at the house, Defendant replied that he did not listen to Mr. Hines and that, instead of responding to the message, he performed an internet search for a defense attorney.

Relative to the surveillance recording from the barber shop, Defendant agreed that he could clearly hear the gunshot and a motorcycle engine. He did not recall hearing women's laughter in the recording. Defendant acknowledged that Arabian Palace was the only business open in the strip mall at the time of the shooting and that people walking in

the parking lot would have been going to Arabian Palace. He stated that "it wasn't [a] busy night" but that cars were in the vicinity and that there "was a lot of commotion going on[.]" When asked whether the victim's "screaming and shouting" should also have been audible on the recording, Defendant denied having testified that the victim shouted. Defendant later agreed, though, that he had testified that the victim was "standing outside of his car and he was using the N word and . . . he was screaming at [him.]" Defendant clarified that the victim "had an attitude" and was aggressive but was not shouting at "the top of his voice."

Defendant testified that, even though he shot at the victim, he did not intend to hurt him. Defendant admitted that he could have chosen not to fire the gun, fire a shot into the air, or fire toward another person. He stated that he fired at the person he thought would harm him. Defendant disagreed, though, that he aimed at the victim. He said that the victim stood on the running board "constantly yelling" that they had guns and reached down. Defendant stated, "I didn't look, I just shot, pow, one time . . . because like I said I didn't try to harm him." Defendant maintained that he did not want to shoot the victim but admitted that the victim was his "target."

Defendant testified that the Arabian Palace security staff knew him and that the bar took security seriously. When asked why he did not call to them for help, Defendant stated that he yelled to a nearby woman, "I think he's fixing to pull a gun on me." Defendant said that he had subpoenaed the woman as a defense witness but that she had not come to court. Defendant agreed that Mr. Zymeri and Ms. Beasley had nothing to gain from their testimony that they heard no "ruckus" in the parking lot before the shooting. He said, though, that they would not have been aware of the argument because ten to fifteen people were waiting in line to enter Arabian Palace and needed to be searched. Defendant stated that the crowd was at its "peak," that the bar would not have closed until 2:30 or 3:00 a.m., and that the security staff would have had their backs to the parking lot. Defendant stated that Mr. Zymeri testified untruthfully that the bar was closing when the shooting occurred.

When asked whether he could have chosen to stay and aid the victim, Defendant answered negatively and reiterated his fear that the victim and Mr. Vazquez had a gun. Defendant denied that the other witnesses were lying about the sequence of events; he said, though, that Ms. Patel and Mr. Vazquez were lying about the victim's not fully exiting the truck.

The State recalled Detective Klarer as a rebuttal witness. Detective Klarer testified that, at Defendant's police interview, he and another detective were present in the room. Defendant was not in handcuffs,[5] and all three men were seated. Detective Klarer denied

---

[5] On cross-examination, Detective Klarer clarified that Defendant had been arrested but was not restrained.

threatening Defendant and stated that he read Defendant his rights. Defendant indicated that he understood his rights. Detective Klarer said that he performed most of the questioning, and he denied telling Defendant that he would be arrested if he declined to talk to the police. He stated that, when he asked Defendant a question "about video," Defendant said, "[W]ell, my lawyer would have to look at that[.]" Defendant also mentioned his lawyer's needing to see certain evidence or said that he should call his lawyer. However, Defendant continued speaking without interruption. Detective Klarer averred that Defendant did not ask to speak to his lawyer until the very end of the interview, at which time the detectives ceased questioning him. Detective Klarer acknowledged that, after the end of the interview, he became frustrated and took a bottle of water from Defendant.

Detective Klarer testified that he interviewed Ms. Patel within two hours of the shooting. He noted his surprise that Ms. Patel was described during the defense's proof as having yelled at Defendant and "using filthy language[.]" According to Detective Klarer, Ms. Patel was the politest person he had ever encountered after having experienced a similar incident. He stated that he asked her for the exact language she used during the incident and that he cursed as an example. Ms. Patel denied having used rude language and explained that she did not "speak like that." Detective Klarer opined that Ms. Patel did not appear to have used any drugs or alcohol.

Detective Klarer testified that he interviewed Mr. Vazquez after Ms. Patel and that Mr. Vazquez did not appear to be intoxicated. Detective Klarer acknowledged that Mr. Vazquez reported alcohol and marijuana use but opined that "it wasn't to the point where it clouded his judgment." He agreed that Mr. Vazquez spoke clearly and intelligently. On cross-examination, Detective Klarer acknowledged that he did not order Ms. Patel or Mr. Vazquez to submit to drug or alcohol testing after the incident.

Ms. Patel testified in rebuttal that the victim never stepped off the truck's running board or walked to the front of it. She noted that, if the victim had done so, he would not have rolled down her window to speak to Defendant. Ms. Patel said, "I don't even recall us being so close to where [Defendant] could have potentially even hit us at all." Ms. Patel also disputed that she spoke angrily to Defendant or used profanity. She averred that she was "not that type of person" and would never speak in that manner. Ms. Patel added that the victim was "pretty protective of [her]" and that she never had to speak to Defendant. Ms. Patel stated that, as soon as Defendant flashed his gun, the victim rolled up Ms. Patel's window because he did not want her to be in the middle "of all that[.]" Ms. Patel denied that she and the victim argued in the truck, and she noted that there was no time to speak to one another. She disputed Defendant's testimony that the argument occurred over a longer period of time; she estimated that the encounter lasted three to four minutes. Ms. Patel also denied that they threatened Defendant, that the truck contained any weapons, or that she ever heard the victim refer to a gun as a "strap."

Ms. Patel testified that Defendant was not wearing his gun when he initially exited the car; she explained that, if Defendant had been wearing it, he would not have had reason to go back to the car and retrieve anything. Ms. Patel stated that Defendant did not sit down in the car and that she could tell he was "doing something" before he stood up outside the car and "immediately flashed his gun" and asked if they had a problem. Ms. Patel testified that, when she saw Defendant's gun, she was terrified because she had never seen one before. She denied that the victim told Defendant that they also had a gun.

On cross-examination, Ms. Patel acknowledged that she remained in the courtroom after her testimony and heard Mr. Vazquez's testimony that she argued with Defendant. Ms. Patel stated that she told Defendant that the space was not a parking spot but denied that she spoke angrily or yelled at Defendant. Ms. Patel had remained in the courtroom after her testimony; she acknowledged that Mr. Vazquez asked the victim to get back into the truck and "leave it alone." When asked whether the victim was "doing something to engage [Defendant]," Ms. Patel responded, "Other than communication, nothing else." Ms. Patel disagreed that their telling the victim to leave meant that the way was clear for the victim to drive away. Ms. Patel stated that she generally agreed with Mr. Vazquez's testimony.

Upon this evidence, the jury convicted Defendant in Count 1 of the lesser-included offense of second degree murder and in Counts 2 and 3 of aggravated assault.

At Defendant's sentencing hearing, Lavergne Police Department Sergeant Russell Howell testified that he assisted MNPD officers in executing Defendant's arrest warrant on May 17, 2018. He stated that the officers went to Defendant's residence, forced open the door, and discovered that Defendant was not home. A subsequent search of the home yielded "just under one pound" of marijuana, a small amount of cocaine, and a loaded AK-47 handgun.

An indictment related to the items recovered at Defendant's home was entered as an exhibit and reflected that, in Rutherford County Criminal Court case number 81161, Defendant was charged with possession of marijuana with the intent to sell or deliver, possession of a firearm during the commission or attempt to commit a dangerous felony, keeping or maintaining a dwelling where a controlled substance was used, kept or sold, and simple possession of cocaine. *See* Tenn. Code Ann. §§ 39-17-417, -418, -432(b)(1), -17-1324(a), 53-11-401. The charges were still pending at the time of the sentencing hearing.

The presentence report was also exhibited to the hearing and reflected that Defendant was thirty-four years old. Defendant described the shooting incident to the presentence report officer as "the most horrible experience of [his] life"; he stated that, although he was sorry for "putting [the victim's family] through this," he "honestly felt

- 22 -

that [he] had no choice in acting the way [he] did." Defendant had previous misdemeanor convictions for public intoxication, unlawful use of drug paraphernalia, two counts of criminal trespass, vandalism, four counts of simple possession of marijuana, theft, and two counts of unlawful possession of a weapon.

The report indicated that Defendant graduated from Middle Tennessee State University with a bachelor's degree in engineering technology. He reported occasional alcohol and marijuana use beginning when he was twenty or twenty-one years old; he stated that he had last used marijuana more than two years previously. Defendant had two sons and one daughter, and he reported having good family relationships. Defendant's Strong-R assessment rated him a moderate risk to reoffend.

Additional exhibits to the hearing reflected that in 2011, Defendant violated his probation in two Rutherford County cases by failing to report and accumulating new criminal charges. Defendant's probation was revoked and his sentence reinstated.

Ms. Patel testified that, at the time of the victim's death, they had known each other for ten years and were cohabitating. She read a statement describing the victim and explaining that he became her family after her parents "disowned" her over their relationship. Ms. Patel described her continuing pain and trauma from the victim's death, including not being able to watch programming involving gunshots, "barely being able to make a drive," and being unable to go certain places, for which she was attending therapy.

Ms. Gutierrez, the victim's mother, testified that the victim was her firstborn and that he was a smart, happy child who made friends with "people of any race." She stated that he dreamed of studying international business, was protective of his siblings, and was always there for friends and family. Ms. Gutierrez said that, at the time of the victim's death, he was starting a swimming pool construction business. Ms. Gutierrez stated that the victim also worked in her family bakery.

Ms. Gutierrez stated that she and the victim had a very close relationship. Ms. Gutierrez described the devastating impact of the victim's death on her family, including her falling into a "deep depression" and having continuing panic attacks, for which she was undergoing medical and psychological treatment. Ms. Gutierrez stated that the victim had a four-year-old son and that it pained her to imagine her grandchild growing up without his father.

Jessica Reza, the victim's sister, submitted a written letter to the court describing the effect of the victim's death on her and her family. She stated that her brother was "rare," generous to others, and did the right thing without hesitation. Ms. Reza urged the court to impose the maximum sentence in light of Defendant's prior criminal charges and opined that he was a "menace to society."

Cesar Reza, the victim's father, testified that the victim provided a good example for his siblings, was loved by his family, and made many friends. Mr. Reza said that he did not think he would ever get past the victim's death. He expressed his disbelief that the incident was a mistake, noting that Defendant had "been convicted before for other things."

Defendant presented several character witnesses on his behalf. Barbara Dixon, Defendant's mother, testified that Defendant was a good person who had been "trying to make a change and get back on track" for five or six years. She apologized to the victim's family for Defendant's "mistake" and stated that two families had been "destroyed" by the situation. Ms. Dixon noted that she lived in Memphis but that she stayed in contact with Defendant via weekly telephone calls. She said that Defendant had a good reputation in Rutherford County and had started working as a little league football coach. Ms. Dixon stated that Defendant never allowed others to tease people in front of him and that he had previously given all of his shoes and clothing to a family member in need. She said that she raised Defendant in the church and that she discussed prayer with him. Ms. Dixon noted that, after the victim's death, Defendant called her upset because he discovered that he and the victim shared a birthday.

Ms. Dixon testified that Defendant had two children, one of whom was fourteen or fifteen months old. She stated that he was an excellent father and that his older child adored him. Ms. Dixon emphasized that she needed Defendant to help care for her during her treatment for brain cancer, noting that her daughter was exhausted from caretaking and that Defendant promised to help her. Ms. Dixon asked the trial court to impose the minimum sentence.

Rochelle[6] Dixon, Defendant's older sister, testified that she communicated with Defendant two or three times per week after he moved to Middle Tennessee. She described Defendant as a loving, kind, and caring person who had "really gotten his life together" in the past five or six years. Rochelle noted Defendant's longstanding interest in working with children and his job with the little league team. She said that Defendant was not a violent person and that the incident in this case, which she characterized as a "tragic accident," was out of character. Rochelle stated that Defendant was a caring and strict father who insisted that his son earn good grades in school and be obedient.

Tamika Conner testified that her older son played for Defendant's little league team. She noted that Defendant helped her son overcome shyness and build self-esteem. Ms. Conner stated that "everyone ha[d] some type of past" but that, in the past two years, Defendant had been an asset to the community and the children on the team. Ms. Conner

---

[6] Because Barbara Dixon and Rochelle Dixon share a surname, we will refer to Rochelle by her first name for clarity. We intend no disrespect.

also wrote a character reference letter, which was entered as an exhibit. The letter added that Ms. Conner trusted Defendant with her children and believed that he acted out of self-defense.

James Cunningham testified that he was head coach of the little league football team and that Defendant worked for him as an assistant coach. Mr. Cunningham stated that Defendant was a "natural" with the children and that they gravitated to him; he noted that Defendant also had a better relationship with the parents than he did. Mr. Cunningham described Defendant as a good father and member of the community who loved his children. Mr. Cunningham also wrote a character reference letter, which was entered as an exhibit. The letter added that Defendant's children meant everything to him and that watching his children grow up from confinement "would be totally unfair."

Krystal Smotherman testified that Defendant was her seven-year-old son's father. Ms. Smotherman described Defendant as an "amazing" father, noting that he contacted their son multiple times a week, coached their son's little league team, and instructed their son daily to respect Ms. Smotherman, Ms. Smotherman's husband, and his siblings. Ms. Smotherman stated that everyone made mistakes and that two families had been destroyed due to the situation, "especially" her son. She asked the court to impose a minimum sentence because her son needed his father. Ms. Smotherman also wrote a character reference letter, which was received as an exhibit. The letter added that after their son's birth, Defendant "turned his life around" to provide for his family. Ms. Smotherman stated that Defendant obtained an apartment and a job. Ms. Smotherman opined that Defendant acted in fear for his life and that "the people involved made a decision when they antagonized and threatened" Defendant. She also opined that children without both parents grew up to make similar decisions as the victim and urged the court to consider Defendant's children.

Defense counsel read aloud a statement Defendant composed. Defendant apologized to Ms. Patel and the victim's family, and he stated that he thought about the incident constantly and prayed for the victim's family. He said, "No matter what situation I was put in or . . . how anybody feels, that will always be a tragic day in my life as well as [the victim's.]"

Additional character reference letters were submitted from friends of Defendant's family, community members acquainted with Defendant through the little league football team, and an employee of the company monitoring Defendant's GPS tracker.

The trial court took the matter under advisement and subsequently entered a written sentencing order. The trial court imposed the maximum twenty-five-year sentence in Count 1 and respective five-year sentences in Counts 2 and 3. The court ordered Counts 2

and 3 to be served concurrently with one another and consecutively to Count 1, for an effective thirty-year sentence.

Defendant subsequently filed a motion for new trial or judgment of acquittal, arguing that the evidence was insufficient to support his conviction in Count 1, second degree murder, and that his conviction should be overturned or modified to involuntary manslaughter. Defendant also requested that the trial court order a new trial acting as thirteenth juror, arguing again that the evidence of second degree murder was insufficient, that Mr. Sanders testified for the defense regarding the argument preceding the shooting, and that Defendant felt "threatened physically" at the time of his police interview. Finally, Defendant argued that the State violated his Second Amendment right to keep and bear arms during its cross-examination. The trial court denied the motion by written order, and Defendant timely appealed.

## Analysis

### I. Sufficiency of the Evidence

Defendant contends that the evidence is insufficient to support his conviction for second degree murder,[7] arguing that "the undisputed evidence" at trial established that the victim "chose" to block Defendant's car and "prevent[ed] . . . Defendant from any type of escape or retreat"; that both parties argued, became upset, and "threatened violence"; that the victim "did nothing to de-escalate the situation and was the aggressor"; and that "Defendant was left with no choice but to defend himself." Defendant requests that this court vacate his conviction in favor of a conviction for voluntary manslaughter "at most." The State responds that the evidence is sufficient.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

---

[7] Defendant does not contest that the evidence was sufficient relative to his two aggravated assault convictions.

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

Second degree murder is "[a] knowing killing of another[.]" Tenn. Code Ann. § 39-13-210(a)(1) (2018). Second degree murder is a "result of conduct" offense. *See State v. Brown*, 311 S.W.3d 422, 431-32 (Tenn. 2010); *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000). Accordingly, the appropriate statutory definition of "knowing" in the context of second degree murder is as follows: "A person acts knowingly with respect to the result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b) (2018). In other words, "the State is not required to prove that Defendant wished to cause his victim's death but only that Defendant knew that his or her actions were reasonably certain to cause the victim's death." *Brown*, 311 S.W.3d at 432.

As instructed by the trial court, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury if:

(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b)(2) (2018). The State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. Tenn. Code Ann. § 39-11-201(a)(3); *State v. Sims*, 45 S.W.3d 1, 10 (Tenn. 2001). Whether the defendant acted in self-defense is a matter for the determination of the jury as the trier of fact. *State v. Dooley*, 29 S.W.3d 542, 547 (Tenn. Crim. App. 2000); *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997).

Viewing the evidence in the light most favorable to the State, the evidence was sufficient for a rational juror to reject Defendant's self-defense argument and find that Defendant acted knowingly when he shot and killed the victim. Defendant does not dispute that he shot and killed the victim after a parking lot misunderstanding escalated to an

argument. Ms. Patel and Mr. Vazquez testified that neither they nor the victim spoke aggressively to Defendant, cursed at him, or threatened him. The victim told Defendant that he did not want his parking spot. Mr. Zymeri and Ms. Beasley, who were standing a relatively short distance away, did not hear the argument. Ms. Patel testified that, after returning briefly to his car, Defendant showed the handle of his gun and asked if they had a problem. Ms. Patel and Mr. Vazquez testified that, after seeing the gun, the victim stood on the running board of the truck to speak to Defendant. After Ms. Patel and Mr. Vazquez urged him to leave and pulled at his clothing, the victim leaned back inside the truck, and Defendant shot him. No weapons were located in or around the victim's truck. Defendant testified that he "didn't even wait to see if [the victim] had a gun" before shooting him. Defendant also testified that he aware that shooting a person could kill him.

All of Defendant's sufficiency arguments relate to the weight of the evidence and witness credibility. It is not the purview of this court to reweigh evidence or substitute our judgment for that of the factfinder. *See Bland*, 958 S.W.2d at 659. Defendant is not entitled to relief on this basis.

## *II. Second Amendment*

Defendant contends that the State violated his rights pursuant to the Second Amendment to the United States Constitution when it "questioned . . . Defendant regarding all aspects of his possession of [his gun] prior to the shooting," arguing that the prosecutor "was, in effect, arguing to the jury that they should take a negative inference from his possession of said weapon." Defendant states that "[s]uch an argument is no different than a prosecutor who questions a [d]efendant's choice not to testify at trial or to remain silent during interrogation." Defendant acknowledges that he made no contemporaneous objection to the line of questioning and requests plain error relief. The State responds that Defendant has not established that a clear and unequivocal rule of law was violated.

Rule 36(a) of the Tennessee Rules of Appellate Procedure states that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." "The failure to make a contemporaneous objection constitutes waiver of the issue on appeal." *State v. Gilley*, 297 S.W.3d 739, 762 (Tenn. Crim. App. 2008). However, "when necessary to do substantial justice," this court may "consider an error that has affected the substantial rights of a party" even if the issue was waived. Tenn. R. App. P. 36(b). Such issues are reviewed under plain error analysis. *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010).

Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *State v. Adkisson*, 899 S.W.2d 626, 642

(Tenn. Crim. App. 1994). In order to be granted relief under plain error relief, five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." *Adkisson*, 899 S.W.2d at 640-41; *see also State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (Tennessee Supreme Court formally adopting the *Adkisson* standard for plain error relief). When it is clear from the record that at least one of the factors cannot be established, this court need not consider the remaining factors. *Smith*, 24 S.W.3d at 283. Defendant bears the burden of persuasion to show that he is entitled to plain error relief. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

In this case, Defendant acknowledges that no Tennessee law supports his contention that the State may not cross-examine a criminal defendant on trial for a homicide involving a gun about his background with guns and knowledge about the consequences of shooting at a person. Indeed, defense counsel candidly admits in Defendant's appellate brief that he was "unable to discover *any* cases that raise this issue during the guilt phase of a trial." (Emphasis added). The sole case upon which Defendant relies is the dissenting opinion in a Wisconsin Supreme Court case examining whether a trial judge improperly relied upon the defendant's having purchased a gun and obtaining a concealed carry permit as a factor in sentencing. *See State v. Dodson*, 969 N.W.2d 227, 232 (Wis. 2022) (Bradley, J., dissenting). Simply put, Defendant has failed to carry the burden of establishing that a "clear and unequivocal rule of law" was violated in his case. Accordingly, Defendant is not entitled to plain error relief.

### III. Sentencing

Defendant contends that his twenty-five-year sentence for Count 1, second degree murder, is excessive, arguing that the trial court erred by applying enhancement factor (1), that Defendant had a history of criminal convictions or behavior beyond that necessary to establish his sentencing range, and factor (6), that the injuries to the victim in Count 1 were especially great. Defendant also argues that the court erred by declining to apply several mitigating factors. Defendant requests that this court reduce his sentence in Count 1 to a minimum in-range sentence of fifteen years. The State responds that the trial court acted within its discretion in imposing the maximum in-range sentence.

In sentencing Defendant, the trial court stated that it had considered the evidence offered at the trial and sentencing hearing, the testimony and letters offered by Defendant on his behalf, the principles of sentencing, and the presentence report. Relative to mitigating factors, the court found that none applied, noting that it relied upon the jury's determination that Defendant was guilty of second degree murder and aggravated assault.

- 29 -

Relative to enhancement factors, the trial court applied factor (1), that Defendant had a history of criminal convictions or behavior in addition to those necessary to establish the appropriate range, to all counts. *See* Tenn. Code Ann. § 40-35-114(1). The court noted Defendant's prior misdemeanor convictions for simple possession, unlawful use of drug paraphernalia, vandalism, unlawful possession of a weapon, trespass, and public intoxication, as well as the "credible evidence" of Defendant's pending Rutherford County charges related to the marijuana, cocaine, and AK-47 handgun recovered at Defendant's residence. The court applied enhancement factor (6), that the personal injuries inflicted upon the victim were particularly great, relative to Count 1; enhancement factor (8), that Defendant had previously failed to comply with the conditions of a sentence involving release into the community, relative to all counts; and enhancement factor (10), that Defendant had no hesitation about committing a crime when the risk to human life was high, relative to Counts 2 and 3 because Defendant shot the victim "in a manner that increased the risk of death" to Ms. Patel and Mr. Vazquez. *See id*. § 40-35-114(6), (8), (10). Based on these considerations, the trial court ordered a sentence of twenty-five years in Count 1 and five years each in Counts 2 and 3.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c) (2020).

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code Ann. § 40-35-210(e) (2020); *State v. Bise*, 380 S.W.3d at 682, 706 (Tenn. 2012). Although the trial court should consider enhancement and mitigating factors, such factors are advisory only. *See* Tenn. Code Ann. § 40-35-114 (2020); *see also Bise*, 380 S.W.3d at 698 n. 33, 704; *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id.* at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence

imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. "[Appellate courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Carter*, 254 S.W.3d at 346.

When the record clearly establishes that the trial court imposed a sentence within the appropriate range after a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *Bise*, 380 S.W.3d at 707. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401 (2020), Sentencing Comm'n Cmts.

In this case, the trial court selected a within-range sentence, detailed its findings on the record, and its decision is presumptively reasonable. *Bise*, 380 S.W.3d at 707. The trial court determined that Defendant was a Range I standard offender. Second degree murder is a Class A felony and has a sentencing range of fifteen to twenty-five years. Tenn. Code Ann. §§ 39-13-210(a)(1), (c)(1) (2018); 40-35-112(a)(1) (2021).

Relative to mitigating factors, Defendant contends that the trial court used an incorrect standard when declining to apply factor (2), that Defendant acted under strong provocation, based upon the jury's verdict. However, even if the court's reasoning was faulty, mitigating and enhancement factors are advisory only, and the court was not obligated to reduce Defendant's sentence even if it were applied. *See* Tenn. Code Ann. § 40-35-114 (2020); *see also Bise*, 380 S.W.3d at 698 n. 33, 704; *Carter*, 254 S.W.3d at 346.

Defendant also states that the trial court "never considered the great support" provided by Defendant's character references. We note that the court explicitly stated at the beginning of the sentencing order that it had considered the testimony and letters presented on Defendant's behalf. The record does not support Defendant's assertion in this regard.

Relative to enhancement factors, Defendant argues without elaboration that the trial court improperly considered Defendant's pending Rutherford County criminal charges when applying enhancement factor (1) regarding Defendant's history of convictions and criminal behavior. Although a trial court may not enhance a defendant's sentence based upon the mere fact of an arrest or pending charges, a court may consider this type of information with other evidence to find that the defendant has a history of criminal behavior. *See State v. Robinson*, 971 S.W.2d 30, 48 (Tenn. Crim. App. 1997) (discussing that, although "a mere arrest record is insufficient to establish criminal conduct, the same is not true for an indictment" and noting that the court properly considered officer testimony about unadjudicated drug sales he witnessed); *cf. State v. Buckmeir*, 902 S.W.2d

418, 424 (Tenn. Crim. App. 1995) (citing *State v. Miller*, 674 S.W.2d 279, 284 (Tenn. 1984)) (concluding that a trial court's consideration of criminal charges was improper for purposes of enhancement factor (1) when no evidence in the record indicated that they were "anything more than charges"). In this case, the court properly considered the indictment, arrest warrants, and Sergeant Howell's testimony about the items he saw recovered at Defendant's home.

In addition, Defendant states that his criminal history "is limited to minor misdemeanors." To the extent that Defendant implicitly argues that the trial court should not have applied enhancement factor (1) in the absence of prior felony convictions, we note that a trial court may properly enhance a sentence based upon prior misdemeanor convictions. *See, e.g.*, *State v. Dorantes*, 331 S.W.3d 370, 391 (Tenn. 2011) (affirming a sentence enhanced two years above the minimum when defendant had three prior misdemeanor convictions); *State v. Madden*, 99 S.W.3d 127, 140 (Tenn. Crim. App. 2002) (discussing that enhancement factor (1) had been applied when a co-defendant had "numerous misdemeanor convictions" which occurred seven or eight years before sentencing). In this case, the court properly considered Defendant's twelve prior misdemeanor convictions when applying enhancement factor (1).

Lastly, Defendant argues that the trial court misapplied factor (6), that the injuries inflicted on the victim were great, because great injury to the victim is an element of second degree murder. We agree that factor (6) should not have been applied. *See, e.g.*, *State v. Gary Wayne Ford*, No. E2019-00684-CCA-R3-CD, 2020 WL 4193711, at *8 (Tenn. Crim. App. July 21, 2020) ("Enhancement factor number six is inapplicable when the death of the victim is an element of the offense") (internal citations omitted).

However, as previously noted, such an error standing alone is no longer a proper basis for this court to reverse a within-range sentence, provided that the court articulated other reasons consistent with the purposes and principals of sentencing. *Bise*, 380 S.W.3d at 706. Here, the trial court properly considered Defendant's history of criminal convictions and behavior and his previous failure to comply with the conditions of release into the community,[8] and these two enhancement factors amply support a maximum in-range sentence. The court did not abuse its discretion, and Defendant is not entitled to relief on this basis.

---

[8] We note that Defendant does not dispute the trial court's finding that he previously violated his probation.

**Conclusion**

For the foregoing reasons, the judgments of the trial court are affirmed.


_____
ROBERT L. HOLLOWAY, JR., JUDGE